Okay. Good morning. May it please the court. Nelson Richards for Appellant, the California Attorney General. I'd like to reserve three minutes for rebuttal. Since July 1, 2019, California's ammunition laws have stopped hundreds of violent felons, those diagnosed with dangerous mental illnesses, and other prohibited people from buying ammunition with impunity. Now, plaintiffs appear to concede that California may conduct background checks on ammunition purchases consistent with the Second Amendment. What they challenge, they contend, is how the state has implemented its laws. Not as to them, but as to an unnamed and amorphous fraction of purchasers. This challenge fails as a matter of law, and the district court abused its discretion when it relied on that legal theory to temporarily enjoin the law's application. This morning, I'd like to touch on three specific legal mistakes that warrant reversal. Mistakes that are not just in the district court's decision, but that are inherent in plaintiff's arguments. The first deals with how the background check laws work, and that leads to the second two issues, which are, second, are the facial challenge, the rules governing facial challenges in plaintiff's standing, and the third issue is the application of the intermediate scrutiny standard to the laws in this case. Now, on the first issue, the district court's decision downplays the basic check, and I think here it's worth noting that there's really two ways that most people can use a background check to purchase ammunition, two ways for most people to purchase ammunition. The first and default option is the basic check. This is a check that is essentially the same as a firearms background check. It does all the same things a firearms background check does, with the exception that it does not rely on the federal NICS database, but it goes into the state's computer databases and looks to see whether the purchaser is prohibited because they have been convicted of a felony, because they've been subject to a mental health hold, because they've been convicted of a domestic violence misdemeanor, and so on. And what's your response to the argument that that basic check regime itself imposes too substantial a burden on Second Amendment rights? The frontline response is it does not because it is fully consistent with this court's decision in Sylvester, right? In Sylvester, this court upheld the 10-day waiting period for firearms purchases, and the ammunition background check is essentially identical to those, but I think beyond that sort of straightforward response, there's the additional response that the plaintiffs haven't really challenged that, right? The district court's decision is 120 pages, and nowhere is there a discussion of the basic check being too burdensome or inadequate. And beyond that, the basic check standing alone, that could be itself sufficient, but it's not the only option that people have, right? They have the standard check, which is the optional procedure that provides a streamlined process for purchasing ammunition. Let me just jump in because I do want to I guess I would have assumed that before you could even get to any argument about why the standard check violated the Second Amendment, you'd have to first knock out essentially the basic check. Because as I understand it, the basic check, as you put it, is the default option, and the standard check is sort of a streamlined version of the background check that we offer to certain people who, I guess, sort of lower risk because you've already got these records. But if you haven't established first that the basic check is itself unconstitutional, I don't see how there could possibly be any deficiency in the standard check, which is just kind of an optional supplemental streamlined version of the background. Your Honor, that is absolutely correct. And if the court takes nothing else away from my discussion today, it is that fundamental point that you first have to overcome the basic check. Does that mean that the basic check is severable from the standard check? Potentially, Your Honor. I'm not sure how that would work because the two really do work in conjunction. Because if the standard check did have some sort of flaw, people would still be able to use the basic check. And I think most people would want the standard check to remain in place. Indeed, that is the vastly more popular form of check that most people use. So even if there were some issues with that check, and there aren't for reasons that I'll get into, but even if there were, I think most people would want that check still available to them, because it is optional. So there's no reason to sever anything, I don't think, sever the standard check, for example, from the basic check, because it is purely an optional procedure. People can always use the basic check. Well, conversely, if we find that the basic check is unconstitutional, you would want to sever the standard check, I assume. Well, again, Your Honor, I think the two do work in conjunction. And I'm not sure how you could run, you couldn't really run standard checks for people, for example, who don't have records in the state's automated firearm system. So yeah, I'm not sure how you really could sever the two. But they do work in an interrelated manner, because people can elect between the two. And the standard check really does provide that sort of baseline default option that's there for everyone to use. And I think that actually provides a segue into the, I guess, reported issues that the district court found with the standard check. And that is that the district court appeared to believe that anyone who had a standard check rejected had been the subject of a complete ban on their right to purchase ammunition. And that's just simply incorrect. I think for the reasons that Judge Wofford was just suggesting, and the reasons we point out in our brief, someone who has a standard check can always use a basic check to purchase ammunition, so long as they pass that basic check. The second flaw in the district court's approach and in the plaintiff's argument is the assumption that when someone has a standard check rejected, that there's been some sort of violation, that the system's not working. And again, that's an assertion that withstands essentially no scrutiny, right? We know that roughly 15% of the standard checks are rejected, but that doesn't tell us much about anything with regard to people's ammunition purchases, because there are reasons for why those rejections occur. Well, isn't that the point, though? So you're saying that the 15, I thought it was 16%, are rejected from the standard check, and we know nothing about that. But why does California assume that they're prohibited and not allow them to purchase any ammunitions? Thank you, Your Honor. I'm glad you mentioned that, because there is no assumption there that the person's prohibited. All a standard check rejection is is a determination that that person is not eligible to use the optional streamlined procedure that the standard check provides. They can still use a basic check, which will allow the state to determine whether that person is prohibited. But a standard check rejection in and of itself is not a determination of someone's eligibility to purchase firearms. But why couldn't the presumption be the other way? Since we don't know anything about this person, why not allow them to exercise their Second Ammunition? Well, because the state's made the determination that a background check is necessary to purchase ammunition to make sure that person's not a prohibited person. We know from both experience implementing the system and from evidence before the system was implemented that prohibited people do regularly purchase ammunition, and the state has an interest in preventing them from getting it. Is there any evidence that any of the 15 or 16% of people are prohibited persons? Not to my knowledge, no. But I think it's worth noting that among that 15 or 16%, and it is sort of a decreasing number, if you look at the third Supplemental Morales Declaration, you see that it started about 18 and it did drop down to about 12-13% by the time the district court ruled, or at least by February of this year. But saying that aside, we know that roughly 20-25% of those rejections correspond to people who have no entry in the automated firearm system whatsoever, right? There's no way to tell whether that person has any sort of record at all. Is that the government's interest, though? I thought the interest is in preventing, you know, mentally ill former convicts. The government has not asserted that the government's interest is only people that have a firearm record are allowed to purchase weapons. That's correct, Your Honor. But for a basic check, excuse me, for a standard check to work, you have to have entry in the system, right? And here it might help if I explain a little bit about what a standard check is, right? I'm aware of it, yeah. Okay, so a standard check relies on the armed prohibited person system, which is essentially running a continuous update on people who have firearms to determine that they've not become prohibited since they lawfully purchased their firearm. And that database has, it's been a little while since I've looked at it, but it has approximately 20,000 people on it. And it's subject to some amount of churn. People come off because firearms are confiscated and people, several thousand people a year are added. So that is a database that's running in the background that's making sure that the people who are using that streamlined check are actually eligible to possess firearms and ammunition. And if you can't do that, that is if there is no record to go to to see if the person has been flagged by the armed prohibited person system, then you're back at the basic check. You're back having to determine as an initial matter whether that purchaser in front of you is a prohibited person. And the way to do that is to take their identifying information and to run it through the state's databases as happens in a basic check. So why isn't that so onerous for someone that we have no idea whether or not they're a prohibited person? I don't think it is onerous. It's the same check that people go through to purchase a firearm that's been around for decades at this point. And if you'd like, I can explain how the process works. I think it's set forth in the various Morales declarations, but essentially someone doing a basic check can have one of two things happen. If their information goes into the system and there are no flags in one of the four databases that I mentioned earlier, that process, the check is processed automatically and it takes a couple hours. But this is often the case. Can I ask an unrelated question? By my count, it looks like the background checks as a whole have found 0.1% of all purchasers are prohibited persons. Is that accurate? Your Honor, I'd have to do the math. At the time, by February 2020, it was 750 people and there had been several hundred thousand transactions. So I'll take If it's about 0.1%, how does that meet the tailoring analysis required under intermediate scrutiny? Well, because the tailoring analysis under intermediate scrutiny requires the comparison of the law's objectives to the challenge regulation to the objectives of the law. And here the objective is keeping firearms and ammunition out of the hands of prohibited people. And there's really two components to this, right? There's the actual active prevention at the point of sale, but then there's also a deterrence factor. And the deterrence factor is something that is very hard to pin down, but I think it's reasonably, most people would agree that firearms background checks actually serve as a deterrent to people going to gun stores and buying firearms. Is there evidence of that in the record? I don't think I saw that. I think that's part of the voter's finding with Prop 16. So if you look at the record, ER around 1693, you can see the voter's findings in connection with enacting Proposition 63 that ammunition background checks work and that they do serve as a deterrent. But beyond that, I think that this isn't an averages game. I think the actual number of prohibited people is actually snooking here. I mean, 750 and growing. It's 100 or so a month, plus or minus, that are stopped. And I think the state has a significant interest in saying, look, there's hundreds of people who are being stopped, prohibited people, dangerous people, who are being stopped from purchasing ammunition because of this law, while at the same time, the vast majority of people who experience this, hundreds of thousands of transactions are taking place in a process that costs a dollar and takes a matter of minutes. So when you talk about tailoring, again, I think, and you actually look at the name plaintiffs in this case, to sort of dovetail this into the standing issue, right? The name plaintiffs in this case provided almost no evidence that they were subject to any burden whatsoever. The only plaintiff who submitted a declaration was Denise Welbing. The only plaintiff who submitted a declaration about her experience purchasing ammunition was Denise Welbing. And she said it took half an hour. I think there's actually some debate in the record on that, but even taking her at her word, it cost a dollar and took a half an hour. So that's the challenge that plaintiffs have to bring here. That's the challenge that they have standing to bring. The facial, what the rule for facial challenges on his head, right? They're saying, don't look at the 85% of cases. Look at this 15% of cases and validate the law based on the 15%. And oh, by the way, don't pay too close attention to that 15% because it's diminishing and a big chunk of that 15% are just ineligible on its face. And as to- Well, that you said that there's no evidence of. No, that, if I did, I apologize. Let me correct that. We know that 20 to 25% of the people who had a standard check rejected had no entry in the automated firearm system. It could actually- But that doesn't mean they're prohibited though. That's- It doesn't. It just means that they have to use the basic check to determine whether they're- Okay. And as to 50% of the rejections, we know that they happen because of one of two reasons. One is that they have a mismatch with their name and the other is that they have a mismatch with their address. The address is actually the most common reason. And we also know that that's something that can be fixed very easily in a process that takes about 10 minutes through the state's CFAR system. So anyone who wants to use the streamlined procedure and have a process that takes a matter of minutes and costs a dollar can do that with a great deal of ease. And what we don't have here is anyone saying they've had any problem. We don't have any plaintiff who said that this has been a difficult process for them. The best we have is two declarations that were submitted after the hearing by people who actually use these procedures to get records up to date in the automated firearm system that they could then use indefinitely going forward to purchase ammunition in a very quick process. That's the UNESCO declaration and the shepherd declarations. So these declarations actually show that people who want to can take advantage of and do that essentially as much as they'd like. And so there's no real burden here. And even if there were, you'd have to assess it based on someone's unique situation, someone's unique circumstances, right? I mean, is the person that they have a standard check rejected because there's an address mismatch and they couldn't get CFARs to work? Is it because they didn't have a firearm in the system and they want to submit a firearms ownership report? I mean, that's my problem with this. Isn't it the government's burden to prove why those people should not be allowed to buy ammunition? And I just haven't seen any evidence to support that. I think it's the same thing with regard to background checks. If you're going to have background checks at all, there's going to be some showing that the person's eligible. There's going to be some determination. And here's the ammunition background checks are identical to the firearms background checks for that reason. So I guess your bottom line, your argument is that you have to be registered as an automated firearm report in order to exercise the right to ammunition. Is that basically it? No, that's not correct. If you want to use the streamlined optional standard check procedure, you have to. That makes sense. But if you don't, if for some reason you have privacy concerns about having your firearms in the system and you have firearms that aren't in the system, it's just as a matter of course, anyone who buys a firearm these days is going to be in the system. But if you had a long gun you purchased, say in 2002, that won't be in the system. If you don't want it in the system, again, for privacy reasons or whatever personal reasons you might have, you can just select to buy. One last question for me. Is that part where the background checks disallow someone that's been rejected from buying ammunition under the standard check, is that severable from the standard check system as a whole? I'm sorry, I'm not sure I follow. So if we found that denying the rejected people from the standard check is unconstitutional, can we just sever that part and allow the rest of the system to go forward? So in other words, just have basic checks? No, you have the standard check, but you have the denied and then approves, and that would go forward. And then those that are rejected would be allowed to purchase ammunition as well. I don't think that would work, Your Honor, because those people would essentially be subject to no meaningful background check at all. And so you'd have people doing a basic check when they could just come in and have a rejected standard check, right? I mean, because you could go in and ask for a standard check and have it rejected, even though you know you have no, you're the proper subject of a basic check, right? You know you have no entry in the system. You can just go to a, and in fact, we think this happens. People test it out. You know, I don't know if I have an AFS entry. Let's have them run a $1 check and see what happens. And under the solution or the option you're proposing, I think no one would ever do a basic check because you could just have a standard check rejected and have no background check at all, including, by the way, felons and other privileged people. There'd be no real record of that because they could submit a fake ID, have it rejected, and there'd be no way to determine who is prohibited and who's not. Okay, why don't we let you pause there and save your two minutes for rebuttal, and we'll hear from counsel for the plaintiffs. Thank you, Your Honors. Erin Murphy on behalf of the AFL-E's. Last year, California became the first state in the nation to require individuals to obtain the government's approval every single time they want to exercise their core constitutional right to obtain the ammunition necessary to make their firearms effective. The problem is California proceeded with this regime without first ensuring that it had in place an accurate, efficient, or transparent scheme for determining whether people are actually eligible to exercise their Second Amendment rights. So what we've ended up with is a regime where law-abiding citizens are routinely being denied the ability to purchase ammunition for reasons having nothing to do with their eligibility to exercise Second Amendment rights. Can I ask you, counsel, are you challenging the constitutionality of the basic check? Yes, we are, Your Honor, and I'd like to talk a little bit about the evidence, if I can, about why we think the basic check is a real problem here. I don't recall any argument in your brief addressing the basic check. All I remember you talking about is the standard check. We do discuss the basic check in our brief, Your Honor, and one of the key things that we discuss in our brief and that Judge Benitez highlighted at page, I think it's page 59 of the record excerpts in his opinion, is the problem that we have evidence here that people who are unable to do the standard check, who are rejected from it, one out of two of them do not go on to successfully do a basic check. That's irrelevant if the basic check itself, hang on, let me, can I finish my question? Sure. It would probably be helpful for you to hear the question. I say it's irrelevant because if the basic check itself is constitutional, and I do want to hear your argument as to why it's not, but if it is constitutional, then it seems to me none of the problems that people encounter in going through the standard check process will matter from a Second Amendment standpoint because they have, they always have the option of going through the valid basic check process. Sure. And if I could, I'll explain why I think the basic check itself has constitutional problems. So the, and the reason I think that evidence that I was just mentioning is highly relevant is because it's the best evidence we have on whether the basic check is unduly burdensome and so burdensome as to deter people or preclude them from exercising their constitutional rights. So which component of the basic check is problematic? Is it the waiting period or the cost? It's the combination of the two. It's the, so for one, you're charging $19 to purchase ammunition that might not even cost $19. Many a box of ammunition costs $10. So, you know, can, I mean, we put below and the state never questioned that you can purchase a box of ammunition for $4. So you could be paying, you know, essentially a 500% tax. And then there's the weight that you're going to have to come back multiple days later to get the ammunition. And here's, here's where, you know, I think those two things, the evidence reflects this because we have this subset of people, this 15% of people who were rejected from the standard check for reasons of, you know, address mismatches or whatever it may be. Okay. And the state itself looked at those individuals and told us that about 100,000 transactions, 80,000 of those, those were distinct individuals. Now, if it were really that easy and no big deal for everyone to pay $19 and wait, you know, two days or maybe even a week for some people to get ammunition, you'd expect to see pretty close to a hundred percent of those individuals just shift over, do the basic check and get their ammunition. Instead, the state itself reported in its data that's available in this third supplemental declaration, all the information around ER 250 to 260, that 50%, 55% of those individuals never went on to purchase ammunition successfully under this regime. And that evidence was substantiated by the numerous affidavits that we put on from vendors who attested to the experience of their customers. And they had customers who regularly, you know, if they were fortunate enough to even have the documentation to try to do this, many of them were deterred by the cost and time that a basic check takes. So here we have the district court had before him uncontested evidence, evidence put on by the state itself that the basic check is having the practical effect of deterring one in two Californians who can't use the state standard check from proceeding with their purchases of ammunition. But what's your response to your opponent's argument that at least as to the 10 day waiting period for the firearms, that actually is controlling on the question, whether the one to three day waiting period on the basic check is constitutional. I don't think it's controlling in this context, your honor, because Sylvester was dealing with a firearms background check. There is no history in California or anywhere else in the country for that matter of having a background check for ammunition, let alone of having a waiting period to obtain ammunition. And I will note that part of problematic, why would it be problematic to have a waiting period for ammunition if it's okay to have it for a firearm? I don't understand that. You need the two obviously in combination to cause the harm that California is trying to prevent. So why would it have any lesser of an interest in preventing dangerous people from getting ammunition than it would from them getting firearms? It's not a question of the degree of the state's interest. It's a question of the suitability of the state's means. An because it's already illegal to obtain the ammunition, to have the ammunition. You know, the only people we're talking about, this number of people, which Judge Bumuteh is 0.1% of individuals that have been identified as prohibitive persons. It's already illegal for them to have ammunition in the first place. The background check at the firearm is supposed to have stopped them from getting a firearm. So you're dealing with a third level of this. Meanwhile, the law abiding citizens have already had to wait 10 days to get their firearm. And now the state says they can wait days upon days every single time that they want to use that firearm for a lawful purpose. That is really much more akin to the government effectively having an ongoing everyday licensing regulation of people's ability to exercise constitutional rights. So I think that's different in kind from a firearms background check, which is evidenced by the fact that no other state in the nation does this. I mean, ammunition transactions have been around. Every bit as long as firearms transactions, and no state has ever thought that it needed to have a redundant background check every time someone purchases the ammunition. And here, I think it's particularly problematic for the state that by its own evidence, I mean, it's not even 750 because they're not including the fact that they got it wrong. About 15 of these individuals were wrong. So it's actually 744 individuals total, 0.1% over a seven month period that were prohibited persons. And I think that's because the state already has plenty of things in place that make it highly unlikely that the people they're going after are going to come purchase their ammunition through these types of lawful channels since it's already illegal for them to do so in the first place. What is your best authority for the proposition that the $19 is too much? Yeah, I mean, I guess I would point the court to the kind of line of jurisprudence about the imposition of fees on the exercise of constitutional rights. And as I've always understood that line of jurisprudence, what you impose as conditions, I mean, it both has to be commensurate with the costs that the state experiences for purposes of regulating, but it also can't be so burdensome as to prevent exercising the right entirely. And I mean, I know it's fanciful hypothetical, but I would certainly think if the state said you have to pay like a million dollar fee to be a constitutional outer limit. And here, I think the best way to address whether this is approaching that constitutional outer limit is to look at the record that we produce. This is an unusual case in that we have this substantial record at the preliminary injunction stage. I don't understand the state to be saying that any of these factual findings were clearly erroneous. I don't know how they could because they're all based on the state's own records. And so, there's some evidence that supports the notion that the $19 actually, that it exceeds the actual cost to the state of running the check. There's not evidence one way or another on that in the record, your honor. I will note, I mean, part of the thing here is 97% of transactions people select the standard check, which is what the state intended. I mean, the scheme was put in place with the idea that people would have a quick and easy route to go where they'd only have to pay a dollar. So, it's a very small percentage of the transactions that are even going through the basic check right now. I do think it's notable that of that 3%, it's about 20,000 transactions. 75% of them have required this manual check of people going and running down additional information. And that's because the state doesn't have in place a comprehensive database that actually tells it whether people are eligible to purchase ammunition. And I do think that's the basic problem here and why this really is an appropriate facial challenge. I mean, if you take it, you know, in another context, if the state put in place a voter ID law, I think it would be incumbent on the state to complement that with an obligation to maintain accurate, up-to-date voter registration rolls. Counsel, why do you have standing? Why do your clients have standing? Sure. My clients have Article 3 standing for the simple reason that they unquestionably are paying more money and spending more time to purchase ammunition. And that's clear injury in fact. It's directly traceable to this regime, which requires them to pay more money and spend more time, and it's directly traceable. If any of your clients have subjected themselves to this licensing regimen, who applied for a standard and who applied for a basic check? So our individual clients applied for standard checks. There's affidavits in the record from both of them. We also here have an association. Who are the two? The two individual members who put information in, there's Plaintiff Johnson and Plaintiff Lindemuth. Those are at 321 and 1544. And 1547, we have an affidavit from Plaintiff Welding. One of your clients passed it and got a purchased ammunition in 30 minutes, right? Yes, Your Honor, but I also would... And what about the other one? So if I can just complete the answer on the plaintiffs we have in this case, we also have an associational plaintiff, Your Honor. The California Rifle and Pistol Association. I'm not on that yet, so just hold your horses. Who else? Who else? Who else beyond... So Plaintiff Welding discussed having this take more time. Plaintiff Johnson... Having this take more time. Having the standard check, Your Honor, the standard check. Did he apply for the standard check? Yes, went through the standard check and put in an affidavit about how much time it took. I'm sorry, what was his name again? I only have... You are undoubtedly more familiar with the record than I am, but I only was able to extract one of your clients who actually even applied under this regime, and he passed the standard check in 30 minutes. Well, Your Honor, I mean, I know you said not to get to this, but one of our clients is the California Rifle and Pistol Association, and that client... Wait, wait. Okay. Just bear with me. I told you we're going to get to that in a minute. We're right now on the individuals, so please just indulge me for a moment or two. Sure. So again, you're right. We have a plaintiff Welvang with an affidavit at 1547 who discusses having gone through the standard check and it taking more time. We have an affidavit, Plaintiff Johnson at 321, who submitted an affidavit about how much time it took to obtain his record in the automated firearm system, that it took three or four months to do so. We have a plaintiff... Did he apply for either a basic or a standard? His affidavit was specifically speaking to the process of trying to update an AFS record, not to his experience with purchasing ammunition. Just trying to give you a complete answer about what we have in the record from the plaintiffs. We have an affidavit from Plaintiff Lindemuth, who reported having had multiple stores he tried to go to no longer even be selling ammunition once this regime took effect. So offhand, those are the... He didn't apply for a basic or a standard, right? His affidavit doesn't speak to the process of applying of the application for the transaction. What do you mean doesn't speak to it? Are you saying that he did it, but he didn't put it in the affidavit, or he didn't do it? I don't know because, I mean, nothing in the record tells us one way or the other, Your Honor. The affidavit does not speak to him, how his experience with going through the ammunition transaction. Okay, so give me the names again of your clients who you think actually participated in the application process, as opposed to thought about it. We have Lindemuth. Who else do we have? The individual plaintiffs who, as to whom I'm aware... Name of names. Your client. Johnson, Lindemuth, and Wellving. That's at ER 321, 1544, and 1547. Those affidavits from individual plaintiffs, which, of course, are just a subset of our plaintiffs. Okay, now I'm sorry. I cut you off. You were anxious to tell me about institutional standing. Sure, and I just would like to make clear that, I mean, we proceeded the way plaintiffs often proceed in a facial challenge, which is we have an associational plaintiff here, the California Rifle and Pistol Association. We have an affidavit in the record from the California Rifle and Pistol Association members who have been unable to purchase ammunition for lack of documentation, have been unable to purchase ammunition because their standard checks were rejected, even though they are not prohibited persons. And we have additional affidavits from members of the CRPA about, you know, one of them had a standard check rejected, I think it was three times. That's Ian Escu at 310, before he was finally able, after 10 days, to get the state to update his records. Another one, Member Shepard at 316, discusses the problems that he had trying to register a firearm with the state. So we have ample evidence here from, you know, we submitted evidence, and then I would note that, you know, the CRPA attested that its members are experiencing these problems. That attestation was confirmed by the state's own evidence, which by the state's telling, if you look at, I think it's ER 261, where they have their table about people who were rejected, the state itself put on evidence there are 45,000 people in California who tried to obtain ammunition through a standard check, were rejected, not because they were prohibited persons, but simply because the state didn't have an up-to-date address for them, or their name was input incorrectly by the vendor, or something like that, that has, gives no one any reason to think they're prohibited, and they never went on to successfully purchase ammunition. Does your, help me understand it, does your amended complaint identify any member of the CRPA who has suffered or will suffer the injury that you think gives you standing? I don't recall that the amended complaint specifically identifies anyone by name, but. Right, so with respect to institutional standing, it's just that, right? You don't have any, you haven't identified any members of the association who applied and were turned down for any reason. Well, no, your honor. As I just noted, at 310 and 316, we have affidavits in the record from CRPA members who are not plaintiffs, they are CRP members who had standard checks rejected. And in addition to that, I mean, I will just note that. And you think that's good enough for institutional standing? Absolutely, certainly at the preliminary injunction stage, your honor. I mean, there's no basis here for Judge Benitez to have questioned the veracity of what CRPA's executive director attested to in his affidavit, which is that members have, in fact, been denied because the only evidence on the record that speaks to that confirms that tens of thousands of Californians have been denied. So I don't know how the judge could have possibly clearly aired or abused his discretion by just accepting at face value evidence that was uncontradicted and in fact was substantiated by the state's own evidence that there are in fact people, likely CRPA members as our executive director attested, who have been unable to purchase ammunition because they have been rejected by the standard check for reasons having nothing to do with eligibility and then did not go on to proceed with the basic check because it is so unduly burdensome as to outstrip the cost of the ammunition itself. So I do think on this case, you know, I mean, it's relatively unusual because the district court took his time and was very careful waiting to look at this evidence and the state a chance to demonstrate that this system was working. And instead in supplemental declaration after supplemental declaration, the state produced evidence that just made things look worse and worse and worse. I mean, we continuously find that 15% of people who are applying for standard. I want to be clear. This is a facial challenge, right? Absolutely, your honor. It's a facial challenge. And the reason it's a facial challenge. It's a facial challenge and it's not an as applied challenge, right? It's not. I mean, we've raised both, but you know, for purposes of the PI, I understand that, you know, judge Benita has ruled that we are likely to succeed on our facial challenge. So we have. That's all that's up here before us, right? That's all that's up here before this court is whether he abused his discretion by, by, by concluding that we're likely to see that succeed on that challenge. If I could just take a moment to explain why I do think this is an entirely appropriate facial challenge case. I mean, our, our, can I ask a quick question before time runs out? If we were to hold that the, that the, the standard check as applied to the 16% or 15% that are rejected because we don't know whether or not that they're prohibited or not. If we find that part unconstitutional, is that severable from the rest of the background check systems? I mean, I, I, I'm not entirely sure that that works candidly on the basis of the way the state set this up. You know, if the state basically kind of kicked everyone over to basic check at that point, I mean, it's just the way, the way the system operates, you know, makes it a little tricky, but I guess I would say, I mean, the way the system works is if there's a mismatch, then, then by law they're required to reject your transaction. And I do think this court could say, you can't do that. You know, whatever else you want to do, you can't tell someone they cannot exercise their constitutional rights just because the state's system doesn't have up-to-date records. At that point, I think the question would then become, I mean, on this record, you know, calling that we're at a preliminary injunction stage. This is abuse of discretion, clear error. Did Judge Benitez clearly abuse his discretion by concluding that a system that causes one out of two people who tried to go the standard check route to be deterred because the basic check is so onerous to be, you know, these are, this is a subset of people who took the time to try to exercise their constitutional rights, yet nonetheless ended up being unable to do so. I think that provides plenty of basis to hit the pause button and return California to the same status quo that California had for 170 years until last year, and that remains in place in every other state in the nation today. Thank you, counsel. Let's see, you have about two minutes left for rebuttal, I think, Mr. Richards. Thank you, Your Honor. Three points, I'll try and make them really quickly. On the institutional standing point, to dovetail with the questions that Judge Parker was asking and to respond to the points that the counsel was making about the CRPA members who They show individualized situations that would need to be analyzed to evaluate this claim, right? Nandu Ionescu is different from William Shepard. They have different approaches, different processes, different reasons for rejections. So any CRPA member who is going to form the basis for standing is going to have to have their case looked at on an individual basis, and that is a component of institutional standing that the plaintiffs cannot and have not satisfied. What about individual standing? What's your position on that? The plaintiff said that Johnson and Welving submitted themselves to this licensing process and didn't succeed. The only plaintiff who said that he or she submitted a background check was Welving. I'll be clear about that. The other two did not submit declarations saying they had undergone background checks. So Welving is the only one. But even there, the challenge is the background check as experienced by them. So the question is, is Ms. Welving having to wait 30 minutes and pay a dollar? Is that unconstitutional? And by the way, it was most likely less than 30 minutes. There's evidence in the record calling into doubt that assertion by her. But even if you take 30 minutes at face value, that is a problem. And really what plaintiffs are trying to do is they're established standing, right? You could have 10 and nine of them didn't get it. But if you have one, you have standing, don't you? Standing to bring the challenge as experienced by that plaintiff. They can't assert an over-breath challenge. They can't assert harms experienced by other people. They can't rely on theories that aren't opposite to them or that don't apply to them. And that's exactly what the plaintiffs are trying to do. Okay. Thank you. Well, if the plaintiffs want to challenge the $1 and a couple minute wait, then yes, but that's not the argument that they made. They did not challenge either the basic check as we talked about earlier, and they did not challenge the standard check as applied to the individual plaintiffs, the $1 and a couple minutes. They're relying on this nebulous group of 15% and they've never really pinned it down about what their experiences are. And that is a fundamental flaw with the approach they've taken here. All right. Thank you, counsel. The case just argued is submitted and we are adjourned for the day. Thank you both. Very interesting case. Thank you.
judges: Parker, Watford, Bumatay